FISCHBECK, Respondent, vs. MIELENZ, Appellant.

*May 11—September 8, 1903.*

*Appeal: Insufficient findings: Further trial: Assignment of judgments partly satisfied: Rights of assignee: Liens: Voluntary assignment: Withdrawal of claim:* Res judicata.

1. Where facts essential to the determination of the rights of the parties have not been found by the trial court and cannot be ascertained from the record on appeal, the cause will be remanded for further trial and findings as to such facts.
2. Upon an execution sale the judgment creditor, a bank, bid in personal property for less than the amount of the judgments, and agreed with the debtor that, after satisfying the indebtedness from the proceeds of such property, it would return any surplus to him. Afterwards, having realized from the property a sum nearly equal to its demand, the bank turned the

remainder of the property over to one M., and assigned the judgments to him, upon his paying a certain sum. M. was acting for the judgment debtor. In a controversy between M. and one upon whose land the judgments were liens, it is *held* that M. merely succeeded to the rights of the bank and was accountable accordingly, and that the judgments were enforceable in his hands only for the balance due thereon over and above what had been realized by the bank from the personal property.

3. The withdrawal of a claim presented in assignment proceedings, and entry of an order or judgment to the effect that the claim was withdrawn and all proceedings thereon dismissed,—the merits of the claim not being passed upon,—is in the nature of a voluntary nonsuit, and the matter of such claim does not thereby become *res judicata* against the claimant.

Appeal from a judgment of the circuit court for Milwaukee county: Lawrence W. Halsey, Circuit Judge. *Reversed.*

This is an action for the partition of the premises described, of which Fred Roth owned the undivided one-fourth interest from April 30, 1895, to August 28, 1896. The controversy here is between the defendant *Mielenz,* to whom five of the judgments hereinafter mentioned were assigned by the bank, as hereinafter stated, and who filed an answer to the cross-complaint of the defendant *Fischbeck,* who has become the owner of Roth's one-fourth interest in the land in question.

It appears from the record, and, among other things, is found, in effect, by the court, that on the day and year last mentioned the Marshall & Ilsley Bank entered by confession six several judgments against Fred Roth in the aggregate amount of more than $12,000, and each of them was duly docketed on that day; that executions were immediately issued thereon, and levied on all and singular the visible and tangible personal property of Fred Roth, including a large stock of machinery, tools, tubs, vats, merchandise, and materials used in the pickle and vinegar factory; that the prop-

erty so levied upon was bid in on the execution sale by the bank for $3,000. After the confession and docketing of said judgments, and on August 28, 1896, Fred Roth made a voluntary assignment for the benefit of his creditors of all of his property, including the land in question, to one Phillip G. Hinners, who, as such assignee, duly sold and conveyed the land in question to August Richter, Jr., April 3, 1897, and that sale and conveyance was duly confirmed by the court May 11, 1897, and subsequently Richter sold and conveyed the land in question to the defendant *Olga Fischbeck.* When the bank bid in the personal property on execution sale, as mentioned, it engaged the services and special skill of Fred Roth to cure, finish, and market the merchandise and stock on hand, a large portion whereof was then still in process of manufacturing or ripening, and it agreed to pay Roth for such service in cash $100 per month and to turn over to him or his order all the surplus, after realizing the amount of the bank's claim or investment, with interest and such costs or expenses as it might incur. Roth acted upon this undertaking, and gave his personal service and attention to finishing and marketing the product. By June 28, 1897, there had been realized from the sale of such personal property in the ordinary course of trade a sum *nearly equal to the bank's demand,* while considerable material, as well as machinery, tools, vats, etc., still remained on hand and undisposed of; and then and there, in consideration of the payment of $400, the bank turned over the rest, residue, and remainder of all property bid in at the execution sale to the defendant *Mielenz,* agreeing to assign to him upon demand the several judgments against Fred Roth, which then stood of record still uncanceled. *Mielenz* was a relative of Roth, and acted in said transaction not for himself, but for the benefit of Fred Roth, and, after Roth's death later on, for the benefit of Roth's family. The bank did assign all its right, title, and interest in and to five of said judgments to *Mielenz* July 10, 1900,

reciting therein a consideration of $1, but gave to *Mielenz* a receipt therefor, of even date, for $400.

On December 9, 1896, the bank, acting under the instructions of *Mielenz,* presented and filed its claim in the matter of the assignment of Roth for the benefit of his creditors, asking to participate in the distribution of a dividend then about to be declared to the extent of the unpaid balance then appearing to be still due on its several judgments, and which the bank then claimed to amount in the aggregate to $9,349.66 and interest. The assignee, Hinners, objected to such claim on the ground, among others, that under the arrangement mentioned said judgments had been paid in full and that there was nothing any longer due from Fred Roth to the bank. The issue thus raised was referred for trial, and a great deal of testimony taken, upon which the referee decided in favor of the bank, holding it to be entitled to participate to the extent of its judgment claims. Upon the hearing of the referee's report before the circuit court the bank moved for a confirmation of the findings of the referee, and Hinners moved to set aside the same. The court thereupon refused to confirm such report, and ordered a re-reference, and further testimony to be taken, for the purpose of taking proofs as to what disposition had been made by the bank of the property which was bid in and purchased upon execution sale, the manner of such disposition, and the sums or amounts realized therefor either in cash or outstanding accounts, and that such re-reference be, and thereby was, confined solely to the particulars above mentioned. Pending such proceedings the bank withdrew its claim, and thereupon, and on November 6, 1898, the court entered its order and judgment that the claim of the bank filed therein be, and the same was thereby, withdrawn, and all proceedings had thereon on the part of the bank be, and they thereby were, dismissed, with costs in favor of Hinners, to be taxed by the clerk of the court. No

further proceedings were ever had to enforce said judgment claims.

Upon such facts the court found as conclusions of law that from and after June 28, 1897, there was nothing any longer due and owing upon said several judgments from Fred Roth by reason of the dealings between the bank and the judgment debtor; that *Mielenz,* in procuring an assignment of such judgments, was a naked trustee for Roth and his family, and that the same ought to be released and canceled of record, because not any longer constituting either a legal or equitable lien upon the one-fourth undivided interest in the premises described, and now owned by the defendant *Fischbeck.* It was further found by the court that the bank held as collateral security for the indebtedness covered by such judgments a second mortgage on lands in the Second and Fourth Wards of Milwaukee, the value of which was greatly in excess of the aggregate indebtedness secured by both of such mortgages; that August 15, 1896, the bank allowed the land known as the "vinegar factory property," in the Fourth Ward, to be sold on such first mortgage for much less than it was intrinsically worth, without the slightest effort on the part of the bank to bid in the same or to compete as a subsequent incumbrancer at the sale thereof; and that August 31, 1897, the bank, without any consideration, and upon the mere request of *Mielenz,* acknowledged part satisfaction and release of record of its second mortgage upon the Roth homestead, to enable the owners thereof to sell the same. Upon such findings the court, among other things, adjudged that the defendant *Albert E. Mielenz* had no claim or lien, legal or equitable, upon the undivided one-fourth interest belonging to the defendant *Fischbeck,* and that his cross-complaint [answer] in that behalf ought to be dismissed, with costs in her favor. From such judgment the defendant *Mielenz* brings this appeal.

For the appellant there was a brief by *Wheeler & Perry,* and oral argument by *C. G. Wheeler.*

For the respondent there was a brief by *Sylvester, Scheiber & Orth,* and oral argument by *F. W. Cotzhausen.*

CASSODAY, C. J.   It is conceded that the five judgments against Roth and in favor of the bank became liens upon Roth's quarter interest in the land in question August 28, 1896.   The important question is whether those judgments were fully paid by the agreements and dealings between the bank and Roth and the bank and *Mielenz,* who acted, not for himself, but for the benefit of Roth during his life, and after his death for the benefit of Roth's family, in respect to Roth's property and services and the judgments.   The agreement with Roth, as found by the court, was that, after the bank should realize the amount of its claim or investment, with interest, costs, and expenses, "all the surplus" or balance of the property should be turned over to Roth or his order.   The court found that as early as June 28, 1897, the bank had "realized from the sale of such personalty, in the ordinary course of trade, a sum *nearly equal to the bank's demand,"* while there "still remained on hand and undisposed of" "considerable material, as well as machinery, tools, vats, etc." But the court fails to find just how much of the bank's demand so remained unpaid at that time, or the value of the property then remaining on hand and undisposed of.   Under such circumstances the bank, on the day and year last mentioned, turned over to *Mielenz* all the rest, residue, and remainder of the personal property it had bid in at execution sale, and also agreed "to assign to him upon demand the several judgments" mentioned, in consideration of $400 then paid by *Mielenz* to the bank.   Of course, the property received by him at the time must have been regarded as of equal value, at least, to the $400 so paid.   The vice president of the bank, who conducted the principal negotiations with

Roth, testified to the effect that all the bank wanted was to get enough out of the property to pay Roth's indebtedness to the bank; that, if there was anything left, the bank was willing to turn it over to Roth, or to anybody he might name; that the bank did not agree to satisfy any judgment, but simply agreed that, if the bank should get enough to pay its debt against Roth, whatever there was left Roth could have for himself, his wife, or his friends; that the bank "agreed to satisfy the debt simply." He also testified, under sec. 4096, to the effect that the bank received out of the property so taken on execution $11,492.93 net, and that that left a balance of principal due of $507.07, and that to that sum should be added $502.51 interest and certain expenses. It is obvious from the evidence, as well as the findings of the court, that the bank made the agreements and acted as mentioned in good faith, and for the purpose of allowing Roth and his family to have the benefit of all sales of the property and all the property over and above what was necessary to satisfy its indebtedness against Roth. The bank only claimed, and Mielenz, as the assignee of the bank, is only entitled to recover, the balance of such indebtedness to the bank over and above what had been realized or received from the property. It is impossible to tell from the record just the amount due the bank, upon a fair accounting, at the time the property was so transferred to Mielenz; and the court made no finding on the question, except as stated. The trial court is the appropriate place for the determination of such questions. The result is that there must be further trial and findings of the court on that question. Brown v. Griswold, 109 Wis. 275, 280, 85 N. W. 363; Bostwick v. Mut. L. Ins. Co. 116 Wis. 392, 92 N. W. 246, 259; Kinn v. First Nat. Bank, 118 Wis. 537, 95 N. W. 969.

2. In view of the findings and evidence mentioned and what has been said, it is hardly necessary to say that the contention to the effect that by the transfer and assignment men-

tioned the indebtedness secured by the judgments, and which had been so nearly paid and satisfied, was thereby revived and made enforceable for the full amount of $12,000 and interest, less the $3,000 which the bank bid in the property for at the execution sale, is without foundation.  By such transfers and assignment *Mielenz* was placed in the position of the bank, and accountable accordingly; but he thereby occupied no better position and secured no superior rights.  It is elementary that "the assignee of a chose in action succeeds to all the rights of the assignor, and these rights, whether legal or equitable, will be recognized and protected by courts of law against all persons having notice of the assignment." 2 Am. & Eng Ency. of Law (2d ed.) 1088.  This court has repeatedly held that the assignee of a judgment or chose in action takes it subject to all the equities between the parties. *Blakesley v. Johnson,* 13 Wis. 530; *Rockwell v. Daniels,* 4 Wis. 432.

3. It is claimed on the part of *Fischbeck* that the presentation of the claim secured by the judgments in the assignment proceedings, the favorable report thereon by the referee, the refusal of the court to confirm such report, and the re-reference thereof, and the withdrawal of such claim pending such proceedings, and the entry of an order and judgment therein to the effect that such claim was thereby withdrawn and all proceedings had thereon on the part of the bank be and were thereby dismissed, with costs, should be regarded as *res adjudicata* against the bank and *Mielenz,* as its assignee. Such is not the law.  It will be observed that the merits of the claim were not passed upon, much less determined.  In such determination a jury trial was, in the discretion of the court, permissible.  No "final hearing" or order was ever made thereon.  Sec. 1699, Stats. 1898.  The withdrawal of the claim simply prevented participation in the estate assigned.  Sec. 1700, Stats. 1898.  While the administration of insolvent estates is to a certain extent governed by equi-

table principles, yet the mere allowance or disallowance of a claim is in the nature of a legal action. *In re Sherry*, 101 Wis. 11, 16, 17, 76 N. W. 611; *Nat. Bank v. Herman*, 114 Wis. 582, 91 N. W. 112. The withdrawal of such claim is in the nature of a voluntary nonsuit. Thus it has been held that a judgment is not *res adjudicata* as to defendants against whom the action was discontinued before verdict. *Newell v. Smith*, 38 Wis. 39. See, also, *Morse v. Stockman*, 65 Wis. 36, 26 N. W. 176. Nor where a judgment of dismissal is entered upon a mere stipulation to dismiss. *Bishop v. Mc-Gillis*, 82 Wis. 120, 51 N. W. 1075. Even in equitable actions, where the dismissal is not upon the merits, it does not operate as a bar. *Spear v. Door Co.* 65 Wis. 298, 27 N. W. 60; *Richards v. Allis*, 82 Wis. 509, 52 N. W. 593. We must hold that the withdrawal of the claim and the action of the court thereon was not *res adjudicata*.

*By the Court.*—The judgment of the circuit court is reversed, and the cause is remanded for further trial and findings as mentioned in this opinion, and for further proceedings according to law.